Veronika Fabian, State Bar 018770
Hyung S. Choi, State Bar 015669
CHOI & FABIAN, PLC
90 S. Kyrene Rd., Suite #5
Chandler, Arizona  85226
tel:  (480) 517-1400
fax: (480) 517-6955
Flagstaff: (928) 779-2226
veronika@choiandfabian.com
   Attorneys for Plaintiff Robert Adams

# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| Robert Adams,<br><br>            Plaintiff,<br>     vs.<br><br>Northern Leasing Systems Inc., a New York Corporation, and Experian Information Solutions, Inc., an Ohio Corporation,<br><br>            Defendants. | NO. _____<br><br>**COMPLAINT** |

## INTRODUCTION

1. This case arises from the predatory collection practices of Defendant Northern Leasing Systems, Inc., ("Northern Leasing"), a New York corporation.

2. Northern Leasing has repeatedly attempted to collect a debt from Plaintiff Robert Adams ("Bob") based on a forged equipment lease agreement despite its knowledge of the forgery.

3. Despite Bob's repeated disputes, Defendants have reported, and continue to report, a charge off in the amount of $989.00 on Bob's Experian credit report based on this forged lease.

## JURISDICTION

4. This Court has jurisdiction over this matter pursuant to 15 U.S.C. § 1681p and supplemental jurisdiction over Bob's state court claim pursuant to 28 U.S.C. § 1367(a).

## PARTIES

5. Bob is a natural person and resides in Flagstaff, Coconino County, Arizona.

6. Bob is a "consumer" as defined under 15 U.S.C. § 1681a(c).

7. Defendant Northern Leasing Systems, Inc. ("Northern Leasing)  is a New York corporation licensed to do business in the state of Arizona.

8. Northern Leasing is a furnisher of information to consumer reporting agencies contemplated by 15 U.S.C. § 1681s-2 that regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies bureaus about consumer transactions or experiences with any consumer.

9. Defendant Experian Information Solutions, Inc. ("Experian") is an Ohio corporation licensed to do business in the state of Arizona.

10. Experian is a consumer reporting agency as defined in 15 U.S.C. § 1681a(f) regularly engaged in the business of assembling, evaluating, and dispersing

information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

## FACTS

11. Bob operates a small welding business in Flagstaff, Coconino County, Arizona.
12. He is married to Tina Adams ("Tina").
13. The name of Bob's welding business is Bill's Welding and Repair, LLC ("Bill's Welding") located at 11850 N. Highway 89 Doney Park.
14. Bill's Welding is a domestic limited liability company, with two members: Bob and Tina.
15. Bob does the welding and Tina does the bookkeeping.
16. In December of 2013, Chet Green ("Green") went, unsolicited, to Bill's Welding to try to sell Bill's Welding a new merchant services account.
17. Upon information and belief, Green was an affiliate of both Northern Leasing, an equipment leasing company, and other various merchant services providers.
18. At the time of Green's solicitation, Tina was not there.
19. At the time of Green's solicitation, Bill's Welding had a contract with Wells Fargo Bank for merchant services.
20. Bill's Welding also banked at Wells Fargo.
21. Bill's Welding owned its own credit card machine, for which it had paid approximately $785.00.

22. Green told Bob that Bill's Welding could get a merchant services account with Merchant Solutions with lower fees and better customer service.

23. Green told Bob that he would buy out Bill's Welding's existing merchant services contract with Wells Fargo if Bill's Welding entered into a new merchant services contract with Merchant Solutions.

24. Based on that representation, Bob agreed to sign a merchant services account for Bill's Welding with Merchant Solutions.

25. Neither Green nor Merchant Solutions ever bought out Bill's Welding's existing merchant services agreement with Wells Fargo.

26. Instead, both Merchant Solutions and Wells Fargo began charging Bill's Welding for merchant services through an automatic deduction from its bank account.

27. Additionally, Merchant Solutions charged Bill's Welding a total of $585 in fees for non-compliance fees for not having a compatible credit card machine.

28. Bob contacted Green, who told him that he would "make it right or take the money out of his own pocket."

29. On April 1, 2014, Green came back to Bill's Welding, purportedly to "correct" the problem.

30. While Green was "correcting" the problem, Bob continued welding in his shop.

31. Unbeknownst to Bob, Green exchanged the credit card machine that he owned with one from Northern Leasing.

32. Green then told Bob "I've got you up and running and I got you a better rate too."

33. Bob did not sign any new paperwork when Green came to his business on April 1, 2014.

34. Upon information and belief, Green forged Bob's signature as a personal guarantee on a leasing agreement with Northern Leasing.

35. When Bob realized that Green had taken his credit card machine, he called Green and demanded its return.

36. Green promised he would but never did.

37. After Green's visit in April of 2014, Bill's Welding began receiving billing statements from a third company, Merchant Services.

38. Again, Merchant Services was deducting these amounts from Bill's Welding's Wells Fargo bank account.

39. Bob also received a letter from Northern Leasing with a purported copy of his leasing contract for the new credit card machine. (Northern Leasing letter dated 4/8/14, attached as Exh. A).

40. The signature that appeared on the Northern Leasing contract was a forgery.

41. Upon information and belief, Green or someone else forged Bob's signature to the contract for Northern Leasing.

42. Now Bill's Welding was being billed by four companies: Wells Fargo, Merchant Services, Merchant Solutions, and Northern Leasing.

43. From May 2014 to August 1, 2014, Northern Leasing deducted a total of $197.52 from Bill's Welding's Wells Fargo bank account for the credit card machine.

44. In July of 2014, Tina closed the Wells Fargo account, which Green had linked to Merchant Services and Northern Leasing for an automatic deduction.

45. At that same time, Bill's Welding stopped using the Northern Leasing credit card machine.

46. Northern Leasing was able to deduct one final payment from the Wells Fargo Account on August 1. 2014, but then was unable deduct any further payments.

47. Consequently, on September 4, 2014, Northern Leasing sent Bob a letter requesting that he pay $49.24 because it had been unable to deduct that amount from Bill's Welding bank account.

48. On October 11, 2014, Tina informed Northern Leasing that the account was set up without their permission and that their credit card machine had been replaced without their knowledge.  (Letter to Northern Leasing attached as Exh. B).

49. In response, on November 4, 2014, Northern Leasing sent Bob a letter stating, in part, as follows:

> As personal Guarantor of the lease agreement, you will be held responsible for the remaining payments on the lease agreement until the lease terms have been fulfilled.
>
> You have entered into a 48-month non-cancelable lease agreement with [Northern Leasing].  The terms and conditions of the lease agreement state the lease agreement is non-cancelable.  Your request to cancel does not have grounds to close the lease agreement before the duration of the lease agreement.

(Northern Leasing Letter dated 11/4/14, attached as Exh. C).

50. Bob continued to receive repeated bills from Northern Leasing for monthly payments on the account.

51. Both Tina and Bob repeatedly orally told Northern Leasing that the lease contract had been forged.

52. On January 5, 2015, Bob filed a police report with Coconino County Sheriff's office.

53. On February 19, 2015, Northern Leasing pulled Bob's credit report even though it knew that the lease on which it was attempting to collect was forged.

54. Because the lease was forged, Northern Leasing did not have a permissible purposes for pulling Bob's credit report under the FCRA. 15 U.S.C. § 1681 b(a)(3).

55. On March 2, 2015, Northern Leasing sent Bob a "Demand for Payment" claiming an outstanExpding balance of $1,505.87. (Northern Leasing letter dated 3/2/15, attached as Exh. D).

56. Northern Leasing's "Demand for Payment" stated in part:

> Due to your continued delinquency and failure to pay the outstanding balance listed above, your account has been referred to my department to initiate a civil action against you as allowed under the personal guaranty in your lease agreement. Accordingly, demand is hereby made for payment in full.

57. Northern Leasing's "Demand for Payment" was signed by "Louis Reina, Account Manager, Legal Collections Department."

58. On April 10, 2015, Northern Leasing sent Bob a letter entitled "Final Demand".

59. Northern Leasing's "Final Demand" stated in part:

> You have failed to respond to our previous Demand for Payment. By copy of this letter, we are directing our attorneys to **commence a civil action against you** to recover all monies due under the lease agreement and applicable law, including **default interest, court costs and attorney's fees** as may be appropriate unless you promptly pay the outstanding balance of **$1,515.38 within ten (10) days from the date of this letter.**
>
> Please be advised that your **delinquency has been reported to the credit bureaus as a charge off or collection account** and will be reflected on your credit report.

(Northern Leasing's "Final Demand" dated 4/10/15, attached as Exh. E)(emphasis in original).

60. Northern Leasing's "Final Demand" was signed by "Louis Reina, Account Manager, Legal Collections Department."

61. Reina, on behalf of Northern Leasing, sent Bob repeated letters entitled "Final Demand" that were virtually identical (with the exception of a changing balance) to the first one.

62. To Bob's knowledge, Northern Leasing has never filed suit against him or Bill's Welding.

63. In addition to the repeated "Final Demand" letters, Reina, on behalf of Northern Leasing, began calling Bob repeatedly on both his cell phone and his business phone.

64. Reina's phone calls and messages were harassing, threatening, and intimidating, leaving Bob feeling upset and anxious that he would be sued.

65. On June 19, 2015, Bob sent back Northern Leasing's machine along with a check totaling $58.48 as "payment in full" on the account. (Check attached as Exh. F).

66. With the $58.48, Bob had paid the total amount due under the lease contract for the period during which he used the machine.

67. Bob had only used the machine because Green had continuously reassured him that he would make it right.

68. Northern Leasing cashed the check on June 29, 2015.

69. However, Reina, on behalf of Northern Leasing, continued to call Bob and harass him about payment, claiming that it had cashed the check "under protest" and therefore he was still liable for the balance.

70. On July 1, 2015, Northern Leasing sent Bob a letter entitled "Forgery Claim".

71. It included a four-page forgery affidavit, which was not only excessive, but also included misleading questions.

72. For these reasons, Bob did not complete the forgery affidavit.

73. Reina, on behalf of Northern Leasing, continued to send periodic "final demand" letters to Bob, virtually identical (with the exception of a changing balance) to the first one.

74. In December of 2015, Bob and Tina decided that they wanted to refinance their home.

75. In the process of refinancing, they learned that Northern Leasing was reporting a charge off in the amount of $989.00 on Bob's Experian credit report.

76. In December 2015, Bob sent a letter to Experian explaining that the lease contract had been forged and that Northern Leasing had cashed their check that stated "payment in full" on it.

77. Once again, Bob sent a copy of his Experian dispute to Northern Leasing.

78. On January 27, 2016, Experian sent Bob a letter stating:

> We have reviewed the documentation you provided with your dispute, but have determined that we are not able to use it to make the changes or deletions you requested. We are contacting the furnisher of the information or the vendor who collected the information from a public record source.

(Experian Letter dated 1/27/16, attached as Exh. G).

79. Upon information and belief, Experian conveyed the entirety of Bob's dispute to Northern Leasing.

80. In addition, Northern Leasing had independent knowledge of Bob's dispute because of its written and oral communications with Bob and Tina about the account.

81. Northern Leasing did not conduct a reasonable investigation of Bob's dispute.

82. Upon information and belief, Northern Leasing verified that a charge off was properly being reported on Bob's Experian credit report.

83. Upon information and belief, Northern Leasing did not tell Experian to note that the Northern Leasing tradeline was disputed by the consumer.

10

84. Upon receipt of Northern Leasing's verification, Experian did not conduct any independent investigation into the accuracy of the Northern Leasing charge off.
85. Instead, Experian simply relied on Northern Leasing's verification that the account was accurate.
86. Experian's investigation was not reasonable.
87. Experian continued to report a charge off for Northern Leasing on Bob's credit report.
88. Bob's Experian credit report did not indicate that the Northern Leasing charge off was disputed.
89. In July 2016, Bob sent a second dispute to Experian.
90. This time he included a declaration signed under penalty of perjury.
91. In response, Experian sent Bob a letter stating:

> We are responding to your request to verify item(s) on your personal credit report. We have previously processed this dispute and the credit grantor has verified its accuracy....Pursuant to Section 611(a)(3)(A) of the Fair Credit Reporting Act, we will not reinvestigate the same dispute again at this time.

(Experian's letter dated 8/4/16, attached as Exh. H).

92. On July 14, 2016, the Coconino County Attorney's office charged Chet Green with forgery and criminal impersonation arising out of Green's forgery of Bob's signature to the lease agreement . *See State of Arizona v. Green*, Case No. S-0300-CR-201600562.  (Docket sheet attached as Exh. I).

93. In November of 2016, Bob sent a third dispute to Experian explaining that the contract was forged and included a copy of the docket sheet from Green's case.
94. On that basis, Bob requested that Experian remove the Northern Leasing item from his credit report.
95. Once again, he copied Northern Leasing.
96. Upon information and belief, Experian conveyed the entirety of Bob's dispute to Northern Leasing.
97. In addition, Northern Leasing had independent knowledge of Bob's dispute because of its written and oral communications with Bob and Tina about the account.
98. Northern Leasing did not conduct a reasonable investigation of Bob's dispute.
99. Upon information and belief, Northern Leasing verified that a charge off was properly being reported on Bob's Experian credit report.
100. Upon receipt of Northern Leasing's verification, Experian did not conduct any independent investigation into the accuracy of the Northern Leasing charge off.
101. Instead, Experian simply relied on Northern Leasing's verification that the account was accurate.
102. Experian's investigation was not reasonable.
103. On December 26, 2016, Experian sent Bob the results of its "investigation".
104. Experian continued to report a charge off for Northern Leasing in the amount of $989.00 on Bob's credit report.

105. This time, however, the trade line indicates that "[a]ccount information disputed by consumer."

106. After Bob submitted his third dispute to Experian, Reina called him on December 13, 2016 and demanded to know why he had once again submitted a dispute to Experian, even though Bob's dispute was explained in full in his letter to Experian, which he had copied to Northern Leasing.

107. On that same day, Reina sent Bob another Notice of Dispute claiming that he executed a personal guarantee on behalf of the lessee identified in the lease agreement and that the account was being correctly reported to the credit reporting agencies.

108. Reina also sent Bob a letter stating that Bob must complete a four-page forgery affidavit in order for Northern Leasing to investigate his claim.

109. It was the same forgery affidavit Bob had refused to complete over a year ago because it was misleading and excessive.

110. In January 2017, Bob sent Experian and Northern Leasing a letter explaining that he believed that the forgery affidavit was misleading and unnecessary as Chet Green had been charged with forgery.

111. Northern Leasing continues to send demand letters to Bob.

112. Northern Leasing continues to call Bob sometimes as early as 6:00 a.m.

113. Experian continues to list a charge off in the amount of $989.00 for Northern Leasing on Bob's credit report.

114. Experian has published Bob's credit report, including the incorrect Northern Leasing charge off, to third parties.

### CAUSE OF ACTION NO. 1: VIOLATION OF THE FCRA
**(Against Northern Leasing Only)**

115. Northern Leasing violated the FCRA by willfully and/or negligently failing to conduct a reasonable investigation of Bob's disputes in accordance with 15 U.S.C. § 1681s-2(b).

116. As a result of Northern Leasing's violations of the FCRA, Bob was damaged in an amount to be determined by this Court.

117. Northern Leasing's conduct, action and inaction was willful, rendering it liable for statutory and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

118. In the alternative, Northern Leasing was negligent, entitling Bob to recover his actual damages under 15 U.S.C. § 1681o.

119. Bob is entitled to recover actual and/or statutory damages, punitive damages, costs and attorney's fees from Northern Leasing pursuant to 15 U.S.C. § 1681n and/or § 1681o.

### CAUSE OF ACTION NO. 2: VIOLATION OF THE FCRA
**(Against Northern Leasing Only).**

120. Northern Leasing is a "person" as that term is defined in 15 U.S.C. §1681a (b).

121. The FCRA establishes very specific rules placing limitations upon an entity (or "person") seeking to obtain a consumer's credit history or the content of a consumer's credit file, as follows:

> (f) Certain use or obtaining of information prohibited. - A person shall not use or obtain a consumer report for any purpose unless -
>
> (1) the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section; and
>
> (2) the purpose is certified in accordance with section 1681e of this title by a prospective user of the report through a general or specific certification.

See 15 U.S.C. §1681b(f).

122. Section 1681 b(a)(3) of the FCRA lists the all-inclusive purposes for which a consumer report can be obtained, as follows:

> (a) In General. - * * * [A] consumer reporting agency may furnish a consumer report under the following circumstances and no other:
>
> ***
>
> (3) To a person which it has reason to believe -
>
> (A) intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer; or
>
> ***
>
> (F) otherwise has a legitimate business need for the information - (i) in connection with a business transaction that is initiated by the consumer; or (ii) to review an account to determine whether the consumer continues to meet the terms of the account.

123. Because the lease contract was forged, Northern Leasing did not have a permissible purpose to pull Bob's credit on February 19, 2015.

124. Northern Leasing had actual knowledge that it had no permissible purpose to obtain Bob's credit information from Experian.

125. Northern Leasing's violation of the FCRA was willful.

126. As a direct and proximate result of Northern Leasing's willful conduct as outlined above, Bob is entitled to $100-$1000 in statutory damages, plus punitive damages and reasonable attorney's fees together with the costs of this action as provided by 15 U.S.C. §1681n.

127. Alternatively, the impermissible access of Bob's credit information constitutes a negligent violation as set forth in 15 U.S.C. §1681o.

128. In that event, Bob is entitled to recover his actual damages in an amount to be proven at trial, plus attorney's fees together with the costs of this action. 15 U.S.C. § 1681o.

**CAUSE OF ACTION NO. 3: INVASION OF PRIVACY**
(Against Northern Leasing Only)

129. Northern Leasing's debt collection efforts taken against Bob were unreasonable.

130. It was foreseeable that Northern Leasing's debt collection efforts would result in extreme mental anguish, embarrassment, humiliation or mental suffering and injury to a person possessed of ordinary sensibilities, under the same or similar circumstances

131. Northern Leasing's debt collection efforts did result in extremely mental anguish, embarrassment, humiliation or mental suffering to Bob.

132. Consequently, Northern Leasing's acts and omissions constitute an invasion of privacy. *Fernandez v. United Acceptance Corp.*, 125 Ariz. 459 (App. 1980).

133. As a result of Northern Leasing's invasion of privacy, Bob suffered damages in an amount to be determined by this Court.

134. In invading Bob's privacy, Northern Leasing acted with an evil mind, intending to injure Bob or consciously disregarding the substantial risk that its conduct would cause significant harm to Bob.

135. Bob is therefore entitled to recover both actual and punitive damages.

## CAUSE OF ACTION NO. 4: VIOLATION OF THE FCRA
### (Against Experian Only)

136. Experian violated the FCRA by willfully and/or negligently failing to conduct a reasonable reinvestigation of Bob's disputes of the Northern Leasing charge off. 15 U.S.C. § 1681i(a)(1).

137. As a result of Experian's violations of the FCRA, Bob was damaged in an amount to be determined by this Court.

138. Experian's conduct, action and inaction was willful, rendering it liable for statutory and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 6181n.

139. In the alternative, Experian was negligent, entitling Bob to recover his actual damages under 15 U.S.C. § 1681o.

140. Bob is entitled to recover actual and/or statutory damages, punitive damages, costs and attorney's fees from Experian pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## JURY TRIAL REQUESTED

141. Bob requests a jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Bob prays that this Court enter Judgment in his favor and against Defendants for the following:

    a.    Actual damages,

    b.    Statutory damages,

    c.    Punitive damages,

    d.    Attorney's fees and costs;

    e.    Interest on the judgment rendered herein at the maximum lawful rate from the date of its rendition until paid in full; and,

    f.    Such other and further relief as this Court deems just and proper.

DATED this 16th day of February, 2017.

CHOI & FABIAN, PLC

By: */s/ Veronika Fabian*
Veronika Fabian
Attorneys for Robert Adams